PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

     *Petitioner-Appellant,*

     v.

SEAN ROBERT FRANCIS,

     *Respondent-Appellee.*

No. 12-1205

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:10-hc-02013-BO)

Argued: May 17, 2012

Decided: July 16, 2012

Before TRAXLER, Chief Judge, and MOTZ and KEENAN,
Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Judge Motz joined.

## COUNSEL

**ARGUED:** Ian James Samuel, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. James Ryan Hawes, THE EDMISTEN, WEBB & HAWES LAW FIRM, Raleigh, North Carolina, for Appellee. **ON**

**BRIEF:** Stuart F. Delery, Acting Assistant Attorney General, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas G. Walker, United States Attorney, Raleigh, North Carolina, for Appellant. William Woodward Webb, THE EDMISTEN, WEBB & HAWES LAW FIRM, Raleigh, North Carolina, for Appellee.

---

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

This case began with the government's initiation of civil commitment proceedings against Sean R. Francis. The government certified that Francis, who had numerous criminal convictions based on his repeated conduct of placing threatening and obscene telephone calls, was a "sexually dangerous person," within the meaning of 18 U.S.C. § 4248. After conducting an evidentiary hearing, the district court determined that Francis was not eligible for commitment, because the government failed to prove by clear and convincing evidence that Francis would have serious difficulty refraining from sexually violent conduct if released.

On appeal, the government argues that the district court erred by failing to make necessary factual findings regarding Francis' prior sexually violent conduct and by failing to determine whether Francis presently suffers from a qualifying mental condition under the relevant statutes. The government contends that the district court improperly based its decision on an "abstract determination" that Francis was unlikely to commit new offenses of a sexually violent nature. After reviewing the record, we affirm the district court's judgment, because the court appropriately considered the elements required for civil commitment under 18 U.S.C. § 4248, and did not clearly err in determining that the government failed to meet its burden of proving that Francis was a sexually dangerous person.

## I.

## A.

The statutory provision that permits civil commitment for sexually dangerous individuals is set forth in 18 U.S.C. § 4248, which is part of the Adam Walsh Child Protection and Safety Act of 2006 (the Act), Pub. L. No. 109-248, 120 Stat. 587.[1] As relevant to this case, the statute provides that individuals in the custody of the Bureau of Prisons (BOP) who are sexually dangerous may be committed civilly after the expiration of their federal prison sentences. 18 U.S.C. § 4248. A "sexually dangerous person" is defined as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is sexually dangerous to others if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

The Attorney General, his designee, or the Director of the BOP may initiate commitment proceedings by filing in the district court for the district in which the individual is confined a certification that the individual is sexually dangerous. 18 U.S.C. § 4248(a). The filing of such a certification stays the release of the individual from custody "pending completion of procedures," including a full evidentiary hearing. *Id.* After the hearing, if the district court concludes that the government proved by clear and convincing evidence that the individual is sexually dangerous, the court "shall commit" that individual to the custody of the Attorney General. 18 U.S.C. § 4248(d). Once committed, an individual remains confined until he is "no longer sexually dangerous to others." 18 U.S.C. § 4248(e). A committed individual may seek periodic review

---

[1]The Act is codified in numerous sections of Titles 18 and 42 of the U.S. Code.

of his confinement no sooner than 180 days from the most recent determination by the district court. 18 U.S.C. § 4247(h).

### B.

Francis first was arrested in 1998 at the age of 20 after he placed two threatening telephone calls to randomly-selected telephone numbers. In both telephone calls, Francis threatened to rape the women who answered the telephone. Francis was convicted in a New York state court of two counts of aggravated harassment and was sentenced to a term of three years' probation.

Shortly after his conviction, Francis pleaded guilty to violating the terms of his probation for failing to participate in sex offender treatment, lying to his probation officer, and failing to report to his probation officer as directed. The state court imposed a sentence placing Francis on continued probation.

In November 1999, Francis pleaded guilty to federal charges, including eight counts of making threatening interstate communications, in violation of 18 U.S.C. § 875(c). These charges arose after Francis placed more than 100 harassing telephone calls to women in several states. In these calls, Francis often asked the women about their sexual behavior, demanded that they masturbate, described any personal information he knew about them, stated that he had been watching them, threatened to harm them if they contacted police or did not do as he directed, and threatened to rape or to kill them. Francis was convicted and sentenced to a term of 22 months' imprisonment and to a three-year term of supervised release.

Based on these federal convictions, Francis' probation resulting from his New York state convictions was revoked and, following that revocation, he received an additional sen-

tence of six months' imprisonment. Francis was released from incarceration in July 2001.

In December 2001, a female college student, "Emily," accused Francis of rape. During the investigation conducted by a local police department, Francis stated that he had engaged in consensual sexual intercourse with "Emily." Francis was not arrested, and the police did not file charges in connection with this incident.

Later in December 2001, Francis' supervised release was revoked after he admitted to making about 50 threatening telephone calls similar in content to the previous calls for which he had been convicted. Based on this violation of the conditions of his supervised release, Francis was sentenced to serve a term of 24 months in prison. He was released in September 2003.

Within three weeks after his release, Francis began making similar threatening telephone calls. As a result, in December 2003, Francis was charged with 26 counts of making interstate threatening communications, in violation of 18 U.S.C. § 875, and four counts of intimidating and threatening a victim, in violation of 18 U.S.C. § 1512(b)(3). Francis was convicted and sentenced to a term of 70 months' imprisonment and to a three-year term of supervised release.

Before Francis' release from prison on January 12, 2009, a BOP review panel determined, based on mental health evaluations completed while Francis was incarcerated, that Francis did not meet the criteria of a sexually dangerous person under the Act. Upon his release, Francis was not required to register as a sex offender.

Francis' term of supervised release included many requirements and conditions, including that he submit to periodic polygraph examinations. During one such examination in 2009, Francis described numerous sexual acts, for which he

had not been arrested or charged, in which he claimed to have sexually assaulted or raped 27 female victims. Francis later denied committing any of these acts.

In September 2009, more than seven months after his release from prison, Francis' supervised release term was revoked based on three violations unrelated to placing threatening telephone calls. The first violation occurred when a probation officer visiting Francis in his home observed that Francis had rented a pornographic movie. Francis admitted to the probation officer that he had viewed six pornographic movies.

The second violation occurred after Francis stated during a polygraph examination that he had engaged in sexual relations with two women he had met on the internet. When Francis refused to identify the women, he violated the condition of his probation requiring that he provide requested information to his probation officer. As a result of committing these violations, Francis was expelled from a mandatory sex offender treatment program. This expulsion constituted the third violation of the terms of his supervised release.

Based on his commission of these three violations, Francis was sentenced to serve a term of six months' imprisonment and a 12-month term of supervised release. Before Francis' scheduled release from prison in February 2010, the government filed a certificate in the district court stating that mental health personnel for the BOP had examined Francis and had issued a preliminary determination that he was sexually dangerous, within the meaning of the Act. The government's certification stayed Francis' release pending an evidentiary hearing. *See* 18 U.S.C. § 4248(a).

C.

At the hearing conducted by the district court, Francis testified that he began making threatening telephone calls at the

age of 13 after his mother informed him that she had received an upsetting, sexually-explicit telephone call. Francis testified that his parents had divorced when he was young, and that he and his mother had had a strained relationship. Francis stated that during his high school years, his mother physically and emotionally abused him. According to Francis, he expressed his anger toward his mother by making threatening telephone calls to women. Francis stated that he would make as many as 100 calls in one night, a few of which would include threatening statements.

Francis stated that the abusive nature of his telephone calls escalated over time, and that he eventually began threatening to rape or to murder the women he called. Francis admitted that by placing the telephone calls, he frightened the women with whom he spoke. He also admitted that the content of the calls was sexually explicit and obscene.

Francis acknowledged his earlier admission that while he was in college, he placed such telephone calls when he was intoxicated or distressed. He also acknowledged having made the statement that when he began dialing the telephone, he "just couldn't hang up" and "couldn't stop [himself]." Francis testified, however, that he had not placed a threatening or obscene telephone call since 2003. He also expressed remorse for frightening the victims of his telephone calls.

The government introduced into evidence Francis' prior admissions of having committed numerous sexual assaults and rapes for which he had not been arrested or prosecuted. The government also introduced into evidence a video deposition of "Emily," who identified Francis as the man who had raped her. Her description of the details of the attack closely matched the details that Francis had provided during his polygraph examination in 2009, when he admitted raping a 20-year-old woman. However, Francis recanted this admission and all his prior admissions of sexual assaults and rapes. He testified that he had fabricated these incidents because he was

concerned that unless he confessed to crimes involving physical contact with victims, he would be terminated from sex offender treatment and would be required to return to prison.

This hearing before the district court also included the testimony of four licensed clinical psychologists, who qualified as experts in the field of forensic psychology. The government presented the testimony of Dr. Hy Malinek and Dr. Rebecca Perkins, who both concluded that Francis was sexually dangerous, within the meaning of the Act. Francis presented the testimony of Dr. Joseph J. Plaud and Dr. Jeffery C. Singer, who reached the contrary conclusion that Francis was not sexually dangerous, as defined by the Act.

Dr. Malinek based his conclusions on his initial review of numerous records and his interview with Francis. In his report, Dr. Malinek stated that Francis is "one of the most prolific sex offenders I have evaluated." Dr. Malinek testified that Francis confessed to him that he had made thousands of threatening and obscene telephone calls. Citing Francis' 12-year pattern of placing such calls, Dr. Malinek opined that Francis suffers from paraphilia, not otherwise specified (NOS), telephone scatalogia.[2]

In assessing Francis' risk of recidivism, Dr. Malinek evaluated Francis using several actuarial risk assessment instruments, and determined that Francis' scores on those instruments were "consistently high," placing his likelihood of recidivism during a five-year period in a range between 30 and 59.7 percent. Based on these results and on his other eval-

---

[2]In his report, Dr. Malinek explained that the Diagnostic and Statistical Manual of Mental Disorders describes paraphilia as an arousal response to sexual objects or situations that deviates from normal arousal activity patterns. Paraphilia involves recurrent and intense sexual urges, fantasies and behavior that involve non-human objects, the suffering or humiliation of self or others, or children or other non-consenting victims. Dr. Malinek described telephone scatalogia as a condition present when an individual is sexually aroused by making obscene telephone calls.

uations, Dr. Malinek opined that Francis was likely to make obscene phone calls or commit sex offenses involving physical contact with victims if he were released.

The government also presented the testimony of Dr. Perkins, an employee of the Federal Correctional Institution at Butner, North Carolina, who conducted her forensic evaluation of Francis based solely on a review of his records. Dr. Perkins concluded that Francis suffers from sexual sadism and antisocial personality disorder. She also opined that it was "highly unlikely" that Francis would fabricate incidents of prior sexual assaults "of such [a] sadistic degree just to prevent expulsion from treatment."

In conducting her evaluation, Dr. Perkins employed one actuarial risk assessment instrument and determined, as did Dr. Malinek, that Francis scored highly on that instrument, indicating a greater likelihood of recidivism than most other sex offenders. In reaching her conclusion that Francis was sexually dangerous, Dr. Perkins also considered numerous factors such as Francis' hostility toward women and his noncompliance with the terms of his supervised release.

At Francis' request, Dr. Plaud conducted an interview and an evaluation of Francis. Dr. Plaud testified that while Francis "could" be diagnosed with paraphilia, NOS, telephone scatalogia, it was a "weak diagnosis at the present time." Dr. Plaud opined that Francis suffers from a type of anxiety disorder, and that his motivation for placing obscene telephone calls stemmed from his need to reduce stress and anxiety. According to Dr. Plaud, Francis' behavior resulted from his anger toward women and was not necessarily sexually motivated.

Dr. Plaud further stated that he found no evidence that Francis had "ongoing urges" to place threatening and obscene telephone calls. Dr. Plaud found compelling the fact that following Francis' most recent release from prison in 2009, he

demonstrated control for more than seven months and did not place any such calls during that period.

Dr. Plaud also testified that he found credible Francis' explanation regarding his reason for fabricating prior incidents of sexual assaults. Dr. Plaud explained that some recovery and treatment programs require participants to provide full disclosure regarding their prior victims, which may encourage some participants to embellish their conduct to remain in the programs. Finally, Dr. Plaud opined that there are no actuarial instruments that adequately can evaluate Francis' risk of recidivism, because his criminal history of sexual offenses was based on solely verbal behavior. Dr. Plaud stated that the groups of sex offenders used for comparative purposes in such actuarial instruments contain very few people who have committed offenses that do not involve physical contact with their victims. Thus, Dr. Plaud concluded that any use of actuarial instruments to evaluate Francis would create misleading results.

Finally, Dr. Singer testified regarding the conclusions he reached after interviewing and evaluating Francis. Dr. Singer stated that he diagnosed Francis with paraphilia, NOS, telephone scatalogia. Dr. Singer opined, however, that this diagnosis was not a "serious" mental disorder that predisposed Francis to commit similar offenses in the future. Dr. Singer stated that he placed great weight on the fact that during the seven-month period in 2009 when Francis was living in the community and was required by the court to have a cellular telephone, Francis did not engage in placing threatening and obscene telephone calls.

Like Dr. Plaud, Dr. Singer opined that the use of actuarial instruments was inappropriate in Francis' case because they were developed to evaluate sex offenders who had been convicted of offenses involving physical contact with their victims. Therefore, Dr. Singer instead used a structured clinical checklist designed to provide a risk assessment indicating the

future risk of sexual violence by a sex offender. Dr. Singer's analysis using that checklist indicated that Francis' risk for committing a sex offense in the future was low.

D.

Following the evidentiary hearing, the district court determined that Francis was not a sexually dangerous person, as defined by the Act. In the court's memorandum opinion, the court first identified the three elements that the government was required to prove by clear and convincing evidence to obtain an order of civil commitment. Those elements included that Francis (1) had engaged or attempted to engage in sexually violent conduct (the prior conduct element); (2) suffered from a serious mental illness, abnormality, or disorder (the mental illness element); and (3) as a result, would have serious difficulty refraining from sexually violent conduct if released (the serious difficulty element). *See* 18 U.S.C. §§ 4247, 4248.

With regard to the prior conduct element, the district court assumed without deciding that Francis previously had engaged in sexually violent conduct. By assuming that this element was satisfied, the district court avoided determining whether Francis' conduct of placing threatening and obscene telephone calls "[rose] to the level" of sexually violent conduct. The district court addressed Francis' alleged sexual offenses involving physical contact only to the extent that the court found credible Francis' testimony that many, if not all, such instances of sexual assault were fabricated or embellished to ensure he remained in sex offender treatment, rather than being returned to prison.

Proceeding to consider the mental illness element, the district court determined that "at one time" Francis suffered from paraphilia, NOS, telephone scatalogia, but found that there was a "question" whether that diagnosis remained accurate. The court concluded, however, that irrespective whether Fran-

cis presently suffers from a serious mental disorder, Francis would not have serious difficulty refraining from sexually violent conduct if he were released from custody.

The district court based this conclusion on the testimony given by Dr. Plaud and Dr. Singer. The court observed that these expert witnesses had explained the difficulty in using traditional actuarial risk assessment instruments to evaluate a person who had not been shown to have engaged in "hands-on or contact sex offenses." The court also emphasized that these experts placed great weight on the recent period during which Francis was released from prison, had a cellular telephone, and yet had not placed any threatening or obscene telephone calls. Thus, the district court denied the government's request and released Francis to the custody of the United States Probation Office. The government timely filed an appeal to this Court.

## II.

## A.

We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012). A court commits clear error when it makes findings "without properly taking into account substantial evidence to the contrary." *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983). A factual finding is clearly erroneous when the reviewing court, after considering the entire record, "is left with the definite and firm conviction that a mistake has been committed." *Hall*, 664 F.3d at 462 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Notably, this standard does not permit a reviewing court to reverse a factual finding on the basis that the reviewing court would have decided the case differently. *Id.* (citing *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

When a district court's factual findings are based on determinations regarding the credibility of witnesses, we give great deference to the district court's findings. *Id.* Because the district court is in the best position to assess the credibility of witnesses, including those designated as expert witnesses, we are reluctant to set aside a finding that is based on the court's evaluation of conflicting expert testimony. *Id.* (citing *Hendricks v. Cent. Reserve Life Ins. Co.*, 29 F.3d 507, 513 (4th Cir. 1994)).

## B.

The issue of law before us on which the parties disagree is whether the district court, in deciding that the government failed to meet its evidentiary burden in this civil commitment proceeding, was required to make factual findings regarding each of the three required elements for civil commitment under 18 U.S.C. § 4248, even though the government's failure to prove any one element would require dismissal of the government's case. Advancing its position, the government contends that the district court erred in failing to make factual findings regarding the issue whether Francis raped "Emily" or committed any other sexual offenses involving physical contact with a victim. The government asserts that the commission of such acts is relevant to any assessment whether an individual will engage in such acts in the future.

The government also contends that the district court erred in failing to determine whether Francis presently suffers from a serious mental illness or disorder. According to the government, absent such a determination, the district court could not decide whether Francis' self-control was impaired because of such a serious illness or disorder. The government maintains that because of these alleged errors, the district court improperly based its decision solely on an "abstract determination" that Francis was unlikely to commit future sexually violent acts if he were released. We disagree with the government's arguments.

Initially, we observe that 18 U.S.C. § 4248 requires the government to prove by clear and convincing evidence that a certified individual is sexually dangerous. Clear and convincing evidence produces in the mind of a fact finder a firm belief or conviction, without hesitancy, about the truth of the allegations. *Hall*, 664 F.3d at 461.

The determination whether a certified individual is sexually dangerous involves a two-step analysis, requiring that the district court determine: (1) whether the individual "has engaged or attempted to engage in sexually violent conduct or child molestation;" and (2) whether the individual is "sexually dangerous to others." 18 U.S.C. § 4247(a)(5). The second step itself involves two distinct inquiries, namely, whether the individual "suffers from a serious mental illness, abnormality, or disorder," and whether, as a result of any such condition, "he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). Therefore, as the district court correctly observed, the government was required to prove three elements by clear and convincing evidence to obtain an order of civil commitment: (1) that Francis has engaged or attempted to engage in sexually violent conduct (the prior conduct element), (2) that Francis suffers from a serious mental illness, abnormality, or disorder (the mental illness element), and (3) that, as a result of any such condition, Francis would have serious difficulty refraining from sexually violent conduct if he were released from custody (the serious difficulty element).[3] *See Hall*, 664 F.3d at 461; *United States v. Comstock*, 627 F.3d 513, 515-16 (4th Cir. 2010).

The prior conduct element addresses a certified individual's previous actions and whether any of those actions constitute

---

[3]Because this case does not involve an allegation of child molestation, we exclude the portion of the statutory language relating to child molestation from our recitation of the required elements for civil commitment under 18 U.S.C. § 4248.

a sexually violent act.[4] By requiring the presence of such a predicate act, the statutory framework minimizes the risk of a court "errantly committing an individual who has in the past successfully suppressed intense and recurrent sexual impulses." *Comstock*, 627 F.3d at 524. Further, this element "provides a safeguard against commitment premised on inexact predictions of future dangerousness." *Id.* If an individual has not engaged in prior sexually violent conduct, a district court need not consider the remaining elements and may dismiss the commitment action.

When a district court determines that a certified individual has committed a predicate act, however, a court also must consider whether that individual is sexually dangerous to others. In conducting this analysis, a court evaluates the individual's present mental condition and the likely prospective effect of that mental condition on his volitional control.

Because a determination regarding an individual's ability to refrain from acting in accord with his deviant sexual interests is not demonstrable with mathematical precision, the mental illness element and the serious difficulty element together ensure that civil confinement is limited to those whose mental illness renders them dangerous beyond their control. *Hall*, 664 F.3d at 463 (citing *Kansas v. Crane*, 534 U.S. 407, 413 (2002)). The issue whether an individual is mentally ill to this degree turns on the significance of the factual information as viewed by the expert psychiatrists and psychologists. *Id.* (citing *Addington v. Texas*, 441 U.S. 418, 429 (1979)).

We conclude that the district court did not err in assuming without deciding that the government met its burden of proof with regard to the prior conduct element. In assessing whether

---

[4]The regulations adopted pursuant to the Act state that sexually violent conduct includes "any unlawful conduct of a sexual nature with another person" that involves, among other things, the "use or threatened use of force against the victim." 28 C.F.R. 549.92(a).

Francis committed a predicate act, the district court addressed Francis' admissions of previous instances of sexual assaults and found credible Francis' testimony that he had fabricated his reports of some, if not all, of these assaults. Rather than deciding whether any of these alleged assaults actually occurred and qualified as sexually violent conduct, the court instead assumed that Francis' undisputed conduct of placing threatening and obscene telephone calls constituted clear and convincing evidence that Francis had engaged in a qualifying predicate act.

Contrary to the government's position, the district court was not required to make factual findings regarding each alleged instance of Francis' prior sexual conduct or to decide whether each act constituted sexually violent conduct. Rather, the district court's assumption that Francis had engaged in at least one predicate act was sufficient to satisfy the prior conduct element. By assuming that the government met its evidentiary burden to establish this element, the district court based its remaining conclusions on the premise that Francis had engaged in sexually violent conduct in the past. *See Comstock*, 627 F.3d at 524.

The district court next considered whether Francis is sexually dangerous to others by addressing his mental condition and volitional control. With regard to the mental illness element, the district court found that Francis, at one point, accurately was diagnosed with paraphilia, NOS, telephone scatalogia. However, the court found credible the testimony of Dr. Plaud and Dr. Singer, who concluded that Francis did not presently suffer from a serious mental illness. Additionally, the district court made clear in its opinion that it did not accept the clinical judgments of the government's expert witnesses regarding Francis' mental condition. Thus, the district court found that there remained a "question" whether Francis' prior diagnosis accurately described his present mental condition.

This uncertainty expressed by the district court regarding Francis' present mental condition demonstrates the government's failure to instill in the fact finder a firm belief that Francis presently suffers a serious mental illness or disorder. *See Hall*, 664 F.3d at 661. Thus, although the district court should have presented a clearer record for our review by affirmatively stating a finding regarding the mental illness element, the court's failure to do so in this instance does not require us to remand the case. The court's lingering doubt about Francis' present mental condition, when considered in light of the government's burden to prove this element by clear and convincing evidence, requires us to conclude that the court resolved this issue in Francis' favor. Accordingly, in answering the question of law presented by the parties, we hold that a district court's failure to make a specific finding regarding each required element under the Act will not necessitate a remand of the case when the record plainly establishes that the district court resolved the issue of proof of one of those elements against the government.

We next observe that the district court could have concluded that Francis was not sexually dangerous based only on the government's failure to prove the mental illness element. *See Comstock*, 627 F.3d at 515-16. However, the court also addressed the serious difficulty element. In conducting its analysis, the district court considered the testimony of the expert witnesses and found that the testimony of Dr. Plaud and Dr. Singer was more convincing. Those experts discredited the use of actuarial risk assessment instruments in evaluating Francis, whose adjudicated sex offenses included only crimes that did not involve physical contact with victims. Also, Dr. Plaud and Dr. Singer emphasized that the most compelling evidence of Francis' ability to control his sexually violent behavior was his most recent experience in the community after being released from prison. Thus, Dr. Plaud and Dr. Singer relied heavily on the fact that for more than seven months during 2009, Francis possessed a cellular telephone but did not place any threatening or obscene telephone calls.

For these reasons, we conclude that the district court, in determining that the government failed to prove that Francis was a sexually dangerous person, did not make an "abstract determination" regarding Francis' likelihood to commit future acts of sexually violent conduct. *See Hall*, 664 F.3d at 463. Rather, the district court appropriately considered the evidence as a whole using the framework provided in the Act and concluded that Francis was not sexually dangerous to others, within the meaning of the Act, because the government failed to meet its burden of proof regarding this required component for civil commitment under the Act.

Our conclusion is not altered by the government's additional contention that the district court erred in failing to address Francis' testimony that he was unable to control himself after he began thinking about placing a threatening telephone call. Francis' previous difficulty controlling his behavior was considered by the expert witnesses in rendering their opinions regarding Francis' present mental condition and volitional control. Further, because the record shows that Francis had not placed such a threatening or obscene telephone call since 2003, this testimony regarding his volitional control related to impulses occurring more than seven years before his civil commitment hearing. Thus, in view of the entirety of the evidence, we cannot say that Francis' previous statements about his inability to control his behavior necessitates a conclusion that a mistake has been made. *See Gypsum*, 333 U.S. at 395.

III.

In sum, we hold that the district court analyzed the evidence in accordance with the framework provided in the Act. In reaching its conclusion that Francis was not sexually dangerous to others and, therefore, was ineligible for commitment under 18 U.S.C. § 4248, the district court weighed the testimony of the several expert witnesses and also considered Francis' own testimony, finding portions of that testimony

credible. Accordingly, based on this record in which credibility determinations and assessments regarding the appropriate weight of expert testimony provided the foundation of the district court's decision, we hold that the district court did not err in determining that the government failed to prove its case by clear and convincing evidence, and we affirm the district court's judgment.

*AFFIRMED*